J. S35015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  H.A.P., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  F.F., MOTHER | : | No. 3313 EDA 2015 |

Appeal from the Decree, October 19, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000611-2015,
CP-51-DP-0000933-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.M. A/K/A | : | IN THE SUPERIOR COURT OF |
| Y.I.M., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  F.F., MOTHER | : | No. 3314 EDA 2015 |

Appeal from the Decree, October 19, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000612-2015,
CP-51-DP-0025118-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.K. A/K/A | : | IN THE SUPERIOR COURT OF |
| Y.K.F., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  F.F., MOTHER | : | No. 3315 EDA 2015 |

Appeal from the Decree, October 19, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000731-2014,
CP-51-DP-0025119-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.F. A/K/A | : | IN THE SUPERIOR COURT OF |
| Y.S.F., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  F.F., MOTHER | : | No. 3316 EDA 2015 |

J. S35015/16

Appeal from the Decree, October 19, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000705-2014,
CP-51-DP-0025117-2010

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND MUSMANNO, J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JULY 13, 2016**

F.F. ("Mother") appeals from the decrees entered October 19, 2015 in the Court of Common Pleas of Philadelphia County, Family Court Division, granting the petitions of the Philadelphia Department of Human Services ("DHS") and involuntarily terminating her parental rights to her dependent children, Y.S.F., a male born in June of 2005, Y.M., a female born in September of 2006, Y.K.F., a male born in January of 2008, and H.P., a female born in October of 2012 (collectively, the "Children"), pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm.

---

[1] DHS was additionally pursuing the termination of parental rights of the fathers and/or putative fathers of the Children, C.L. a/k/a C.L.-M., G.M. a/k/a G.E.M., S.K. a/k/a S.L.K., and B.P. a/k/a B.K.P., respectively, but could not proceed on October 19, 2015, due to issues with service and/or appointment of counsel.  (Petitions for involuntary termination of parental rights, 12/18/14 and 9/2/15; notes of testimony, 10/19/15 at 4-5, 47-49.)  The court, however, did additionally grant a separate decree, also on October 19, 2015, involuntarily terminating the parental rights as to the unknown father of Y.S.F.  (Decree of involuntary termination of parental rights, 10/19/15.)  Further, a review of the certified record reveals that, by decrees dated January 11, 2016, the parental rights of G.M. and S.K. were terminated as to Y.M. and Y.K.F., without appeal.  (Decrees of involuntary termination of parental rights, 1/11/16.)  A hearing was next scheduled for June 1, 2016 with respect to H.P. and Y.S.F.  None of the Children's fathers and/or putative fathers are parties to the instant appeals of Mother.

- 2 -

The relevant procedural and factual history was summarized by the trial court as follows:

> This family has an extensive history with DHS. In October of 2009[,] DHS became involved with the family because one of the children, Y.K.F., received a burn on his arm which was not treated medically for two days. The mother, F.F.[,] was offered parenting skills classes but refused them. DHS learned that the mother, F.F.[,] had a history of marijuana use, however, she refused drug/alcohol treatment. Furthermore, the family home was inappropriate because it did not have any heat. The family used the oven to heat the home.
>
> On January 14, 2010, In-Home Protective Services (IHPS) was implemented through Tabor Children's Services. The IHPS worker informed DHS that F.F. refused to stop heating the home with the oven. The mother, F.F.[,] refused to allow the IHPS social worker scheduled access to her home to evaluate the safety of the home. Furthermore, the mother, F.F.[,] refused to take Y.M. for a ChildLink evaluation. Lastly, the mother refused to attend a drug treatment program.
>
> On February 25, 2010, IHPS was discharged.
>
> The children were in the care and custody of DHS from February 26, 2010 to January 3, 2012.
>
> On January 4, 2012, the children, Y.M., Y.S.F.[,] and Y.K.F.[,] were returned to the mother, F.F.
>
> [In October of 2012], H.P. was born to F.F.
>
> On May 1, 2013, DHS received a General Protective Services (GPS) report alleging that the mother, F.F.[,] was not providing Y.M. with proper clothing and that all four children's hygienic needs were not being met. Furthermore, the report also alleged that the family lacked appropriate housing. DHS visited the home and observed that there was no food in the

home, [sic] exposed wires in the basement. Moreover, the children did not have any beds. The children were also wearing ragged, dirty and ill-fitting clothing. Lastly, the three older children were at a park without appropriate adult supervision. The report was substantiated.

On May 2, 2013, DHS obtained an Order of Protective Custody (OPC) for the children. The children, H.P., Y.S.F.[,] and Y.K.F.[,] were placed in foster care through Northern Children's Services. Y.M. was placed in the care and custody of her father.

A shelter care hearing was held on May 3, 2013. Master Carson ordered the child, Y.M., to remain with her father under DHS supervision. Master Carson ordered the temporary commitments of the remaining three children to the care and custody of DHS.

On May 13, 2013, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated Y.S.F. and Y.K.F. dependent and committed them to the care and custody of DHS. Judge Irvine transferred legal and physical custody of H.P. and Y.M. to their respective fathers. Judge Irvine discharged their commitments to DHS and their dependent petitions.

In or about June, 2013, DHS learned that Y.M. and H.P. were returned to the mother, F.F.[,] by their respective fathers.

On May 9, 2014, DHS filed an urgent petition for Y.M.

On May 29, 2014, an adjudicatory hearing was held for Y.M. before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated Y.M. dependent and committed her to the care and custody of DHS.

On June 23, 2014, DHS filed an urgent petition for H.P.

On July 2, 2014, an adjudicatory hearing was held for H.P. before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated H.P. dependent and ordered that H.P.'s dependent petition remain open. Judge Irvine further ordered that the mother, F.F.[,] had until July 7, 2014 to produce H.P. to DHS.

On July 7, 2014, a permanency review hearing before the Honorable Jonathan Q. Irvine regarding H.P. was held. Judge Irvine ordered that H.P. be placed into the care and custody of DHS at the Bar of the Court.

The matters were listed on a regular basis before judges of the Philadelphia Court of Common Pleas -- Family Court Division -- Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 [Pa.C.S.A. § 6351], and evaluated for the purpose of determining or reviewing the permanency plan of the child[ren].

In subsequent hearings, the DRO's reflect the Court's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

Trial court opinion, 1/20/16 at 1-3 (unpaginated) (citations to record omitted).

DHS filed petitions for termination of parental rights and goal change on December 18, 2014, as to Y.K.F. and Y.S.F., and September 2, 2015, as to Y.M. and H.P. On October 19, 2015, at a contested goal change/termination hearing as to all four children, DHS presented the testimony of Dr. Erica Williams, an expert in psychology with a specialty in parenting evaluations, who performed an evaluation of Mother in May of

2014,[2] Cynthia Rogers Robinson, DHS social worker supervisor, and Bari Morgan, Northern Children Services case worker. Mother, who had relocated to Georgia, testified on her own behalf. At the time of the hearing, Y.K.F. and Y.S.F. had been in placement for 29 months, Y.M. had been in placement for 16 months, and H.P. had been in placement for 15 months. By decree entered October 19, 2015, the court involuntarily terminated the parental rights of Mother.[3]

On October 27, 2015, Mother, through appointed counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this court consolidated **sua sponte** on November 20, 2015.

On appeal, Mother raises the following issues for review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, F.F.[,] pursuant to 23 [Pa.C.S.A. § 2511(a)(1)] where Mother presented evidence that she tried to perform her parental duties[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, F.F.[,] pursuant to 23 [Pa.C.S.A. § 2511(a)(2)] where Mother presented

---

[2] Dr. Williams issued reports on May 12, 2014 and June 6, 2014, which were marked on the record at the hearing as DHS Exhibit 4, in connection with this evaluation. (Reports of forensic evaluation, 5/12/14 and 6/6/14.)

[3] While the opinion of the trial court, as well as the briefs of Mother and the Child Advocate, additionally reference a goal change to adoption, a review of the record reveals that the trial court did not so order on October 19, 2015. (Permanency review orders, 10/19/15.)

evidence that she has remedied her situation by taking parenting and anger management counselling and has the present capacity to care for her children[?]

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, F.F.[,] pursuant to 23 [Pa.C.S.A. § 2511(a)(5)] where evidence was provided to establish that the children were removed from the care of the Mother and Mother is now capable of caring for her children[?]

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, F.F.[,] pursuant to 23 [Pa.C.S.A. § 2511(a)(8)] where evidence was presented to show that Mother is now capable of caring for his [sic] children after she completed parenting classes, secured employment and she completed anger management[?]

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, F.F.[,] pursuant to 23 [Pa.C.S.A. §] 2511(b) where evidence was presented that established the children had a close bond with their Mother for the most part of their lives. Additionally, Mother consistently visited with her children and had continuous telephone contact with her children for the entire time her children were in placement[?]

Mother's brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817,

826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d at 1190.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination pursuant to Sections 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511 (a)(2), (b).

We first examine the court's termination of Mother's parental rights under Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216

(Pa.Super. 2015), quoting **In re A.L.D.**, 797 A.2d 326, 337 (Pa.Super. 2002).

In the case at bar, in discussing Subsection 2511(a)(2), the trial court highlighted the testimony of Dr. Erica Williams, an expert in psychology with a specialty in parenting evaluations, who performed an evaluation of Mother in May of 2014, that Mother "did not have the capacity to provide a safe or permanent environment for the children." (Trial court opinion, 1/20/16 at 5 (unpaginated).) The court further noted the testimony of the social worker[4] that Mother "cannot emotionally parent the children in a mature manner." (**Id.**)

In arguing that the trial court erred and/or abused its discretion in terminating her rights pursuant to Subsection (a)(2), Mother contends that "grounds do not exist to terminate [her] rights under subsection (a)(2) because she has the present capacity to care for her children." (Mother's brief at 17.) Mother asserts that she has "substantially completed" her Family Service Plan ("FSP") goals of parenting classes and anger management, that she visits and maintains regular contact with the Children, and that she has found employment and housing in Georgia and can "now provide a safe home for herself and her children." (**Id.**)

---

[4] While the court does not reference the social worker by name, upon review, the court appears to be referencing the testimony of Northern Homes case worker, Bari Morgan. (Notes of testimony, 10/19/15 at 32.)

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). Dr. Williams testified that Mother "did not present with a capacity to provide safety or permanency of the children." (Notes of testimony, 10/19/15 at 11.) Dr. Williams testified that her opinion was based on both historical as well as current concerns, stating as follows:

> That was based on both historical concerns presented[,] as well as current concerns presented at that time. Historically, [Mother] had come because there was [sic] concerns of hygiene of the children, provision of food for the children, condition of the housing. Additionally, [sic] year prior to her current case there was [sic] concerns that she may or may not have burnt one of her children resulting in the children's removal.

> In terms of current concerns, [sic] the time of the evaluation, it was reported that [Y.M.][,] who was actually back in her care at the time of the evaluation[,] was truant from school, that during a visit there was physical abuse of [Y.K.F.], that [Mother] admitted to [sic] DHS worker occurred. As well as [Y.K.F.] then had some health issues, and [Mother] was the [sic] not available and made it difficult to complete the information and the paperwork needed for him to get treatment.

> Additionally, when she met with us, she presented as very oppositional, there was a lack of insight regarding what role, if any, that she played in (inaudible) involvement, and she denied all the issues presented by DHS. So, all those different concerns combined caused the opinion that she did not have capacity at the time.

*Id.* at 12-13.

Further, DHS social worker supervisor, Cynthia Rogers Robinson, testified to Mother's inability or unwillingness to complete her FSP goals, despite knowledge, including drug and alcohol treatment, mental health treatment, in the form of individual therapy with a licensed practitioner having some knowledge or facts about personality disorders, anger management,[5] and proof of employment. (*Id.* at 20-24.)

> One of the last times I had spoke [sic] to [Mother] and she was saying she was having difficulty getting the services[,] I recommended that she contact Georgia Children and Youth, and I said they were [sic] perhaps give her information on the things that we had asked her to do at her FSP.

*Id.* at 24. Mother, however, offered no evidence as to making such efforts. While Ms. Rogers Robinson acknowledged that Mother had attended some parenting classes, she did not have a certificate of completion and indicated this also remained outstanding. (*Id.* at 20-21.)

Likewise, Bari Morgan, Northern Children Services case worker, noted Mother's refusal to complete her goals or make doing so a priority, despite weekly visits and her awareness of what was required. (*Id.* at 31-32.)

> My concern is that they've been going at this since May of 2013. She [sic] supposed to get -- we talked about meeting her goals, getting parenting

---

[5] At the hearing on October 19, 2015, Mother for the first time testified to participation in in-class anger management classes, rather than on-line, and presented a certificate of completion dated October 17, 2015, just two days prior to hearing. (Notes of testimony, 10/19/15 at 38-39; Mother's Exhibit 1.) Ms. Rogers Robinson testified to Mother proposing an on-line course and advising Mother that in-class was preferable. (Notes of testimony, 10/19/15 at 23-24.)

classes, anger management, all those things, but this has been repeatedly something she said she's going to do. Or just outright refuses to do.

Mom can be very difficult, when working with her, and just, when I spoke to you, I described her as cantankerous. No matter what it is, if we say up she says down, if we say left she says right. She's just difficult.

My concern is that it's -- whenever it comes to a possible goal change hearing then everything that she needs to do she does it in that last second but all of the time she had prior to that it's not an investment to do it prior to that.

*Id.* at 31. In response to whether Mother completed any of her objectives,

Ms. Morgan further stated:

The one mom told me that she did at [sic] anger management online class, but that wasn't sufficient to do that because there was no interaction much like the previous worker spoke about, there wasn't interaction between her, and the actual person that runs the anger management class, it was online, but other than that, oh, and she did the parenting capacity evaluation.

*Id.* at 32.[6]  Hence, the record substantiates the conclusion that Mother's

repeated and continued incapacity, abuse, neglect, or refusal has caused the

Children to be without essential parental control or subsistence necessary for

their physical and mental well-being. ***See In re Adoption of M.E.P.***, 825

A.2d at 1272.  Moreover, Mother cannot or will not remedy this situation.

***See id.***

---

[6] Similar to Ms. Rogers Robinson, Ms. Morgan could not confirm Mother's completion of parenting classes. (Notes of testimony, 10/19/15 at 33.)

We next determine whether termination was proper under Section 2511(b). With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, 620 A.2d at 485, this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

***In re T.S.M.***, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." ***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d 1108, 1115-1116 (Pa.Super. 2010) (internal citations omitted).

As further recognized in **T.S.M.**:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. **See**, **e.g.**, **R.J.T.,** 9 A.3d at 1190 (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

**T.S.M.**, 71 A.3d at 268-269.

In the instant matter, the trial court indicated that "the testimony established the children do not always have an appropriate bond with the mother." (Trial court opinion, 1/20/16 at 6 (unpaginated).) Further, the court noted, as testified by the social worker,[7] "all of the children are in

---

[7] Again, while the court does not reference the social worker by name, upon review, the court appears to be referencing the testimony of Northern Homes case worker, Bari Morgan. (Notes of testimony, 10/19/15 at 34-36.)

pre-adoptive foster homes," and "it is in best interest of all of the children to terminate mother's parental rights" and proceed with adoption. (*Id.*)

Mother, however, in arguing that the trial court erred and/or abused its discretion by terminating her parental rights pursuant to Section 2511(b), claims that termination does not serve the Children's physical and emotional needs and welfare. (Mother's brief at 19.) Mother avers that "the oldest three children have lived with [her] for the most of their lives and has [sic] a strong bond with [her]." (*Id.*) Mother references testimony of a "bond" between her and the Children. (*Id.*) Interestingly, Mother also blames unrealistic goals, which did not allow for unsupervised visitation. (*Id.*)

Here, the record likewise corroborates the trial court's termination pursuant to Section 2511(b). Initially, we note that, the Children are all in pre-adoptive homes.[8] (Notes of testimony, 10/19/15 at 44-45.) Although Mother had visitation with the Children, this visitation was not unsupervised.[9] (*Id.* at 27.) Moreover, Bari Morgan, the Northern Homes case worker, who supervised the visits, testified to concerns. Specifically, Ms. Morgan related that Mother would encourage the boys, in particular, to be disrespectful to their foster parents. (*Id.* at 28.) Further, Mother would

---

[8] Notably, Y.M. and H.P. are placed together. (Notes of testimony, 10/19/15 at 35-36.)

[9] Dr. Williams' report additionally references Mother not being permitted contact with one of the children. (Report of forensic evaluation, 5/12/14 at 4.)

tell [Y.K.F.] that he could not come to visits because of his behavior, which would then cause his behavior to become worse. (*Id.* at 29.) In addition, Mother was verbally aggressive toward the Children and would just let them "cry it out" when upset due to a short visit. (*Id.* at 30.) Likewise, as emphasized by the trial court, Ms. Morgan testified that, while the Children have a bond with and love Mother, it is not always an appropriate bond. (*Id.* at 36-37.) Therefore, Ms. Morgan attested to her opinion that, despite emotional harm, it is in the Children's best interests to terminate Mother's parental rights and proceed with adoption. (*Id.* at 34-36.) Ms. Morgan noted her belief that "children who love their families struggle with not being able to be with their families." (*Id.* at 35.) As a result, she testified that the Children would suffer emotional harm. (*Id.* at 35-36.) Nevertheless, in her opinion, regardless of the emotional harm, it is in the best interests of the Children to terminate Mother's parental rights. (*Id.*) Thus, as confirmed by the record, the emotional needs and welfare of the Children favor termination. Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Based on the foregoing analysis of the trial court's termination of Mother's parental rights, we affirm the decrees of the trial court.

Decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/13/2016